UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BRIAN ARMON DUCKSWORTH,

                    Plaintiff,

    v.                                  Case No. 21-cv-197-pp

HANNAH UTTER,

                    Defendant.

---

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 51), GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 58), DENYING AS MOOT PLAINTIFF'S MOTION TO APPOINT COUNSEL (DKT. NO. 70), DENYING PLAINTIFF'S MOTION TO ADD WITNESS/EVIDENCE TO RECORD AND DISMISSING CASE**

---

Plaintiff Brian Armon Ducksworth, who is representing himself, is proceeding under 42 U.S.C. §1983 on an Eighth Amendment claim against the Health Services Unit (HSU) Manager at Green Bay Correctional Institution. Both parties have moved for summary judgment. Dkt. Nos. 51 (plaintiff), 58 (defendant). The plaintiff also has asked the court to appoint him counsel, dkt. no. 70, and has asked to add a newly-discovered witness/evidence to the record, dkt. no. 71. The court will deny the plaintiff's motion for summary judgment, grant the defendant's motion for summary judgment, deny as moot the plaintiff's motion to appoint counsel, deny the plaintiff's motion to add witness/evidence to the record and dismiss this case.

## I.    Facts

### A.    <u>Procedural Background</u>

On February 16, 2021, the court received the plaintiff's complaint asserting claims against HSU Manager Hannah Utter and other medical staff at

Green Bay. Dkt. No. 1. Three days later, the court received from the plaintiff an amended complaint against Utter and several unnamed John and Jane Doe defendants. Dkt. No. 5. The plaintiff then filed a motion for leave to supplement his complaint, dkt. no. 8, a motion to compel, dkt. no. 9, and a motion for leave to amend his complaint a second time, dkt. no. 11. On March 4, 2021, the court ordered the plaintiff to pay an initial partial filing fee and denied his motion to compel as moot. Dkt. No. 12. The plaintiff paid the initial partial filing fee and filed another motion for leave to amend his complaint. Dkt. No. 14.

On April 16, 2021, the court issued an order denying the plaintiff's motions to amend and supplement his complaint. Dkt. No. 15. The court explained that the "plaintiff's first request to amend his complaint complied with the national and local rules," but that his "subsequent proposed amended complaints d[id] not comply with the court's local rules" because they sought to add additional defendants and claims without including any of the allegations or defendants from the prior complaints. Id. at 3. The court explained that it would not allow the plaintiff "to amend his complaint piecemeal—a new defendant here, a new claim there, bit by bit in different pleadings." Id. at 3–4. The court told the plaintiff that it would "treat the first amended complaint (Dkt. No. 5) as the operative complaint" but would give him "an opportunity to file a comprehensive second amended complaint that includes *all the claims* the plaintiff wants to pursue against *all the defendants* he wants to sue." Id. at 4.

Over the next two months, the plaintiff filed a second amended complaint (as the court had instructed), dkt. no. 17, but he also filed a motion to amend his complaint and for joinder to his original complaint, dkt. no. 16, a second motion to amend his complaint, dkt. no. 18, and five letters complaining about the conditions at his institution or seeking to add additional claims, defendants or both, dkt. nos. 19, 19-1, 20, 22–23. In a February 9, 2022 order, the court described the plaintiff's "many documents" as creating "a confused mess." Dkt. No. 25. The court detailed the contents of the letters and proposed amended complaints, each of which named different defendants and sought to proceed on unrelated claims. Id. at 2–9. The court explained that what the plaintiff sought to do was not permissible under the Federal Rules of Civil Procedure. Id. 9–10 (citing George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007); and Fed. R. Civ. P. 18(a) and 20(a)(2)). The court declined to screen any of the proposed amended complaints, giving the plaintiff "a final opportunity (truly—a *final* opportunity) to clean up the docket" and file a final, amended complaint. Id. at 12–13. The court advised the plaintiff that if he did not follow the court's orders to file "a complete, comprehensive amended complaint," the court would screen only his first amended complaint (Dkt. No. 5) and would deny any additional motions. Id. at 14.

Despite that order, the court received from the plaintiff yet another motion to amend his complaint, dkt. no. 26, a proposed third amended complaint, dkt. no. 28, and a letter that the clerk's office docketed as a motion to dismiss, dkt. no. 29. On August 24, 2022—eighteen months after the

3

plaintiff had filed his original complaint—the court "enforce[d] its previous order, den[ied] the plaintiff's motion to add new claims and screen[ed] only the plaintiff's first amended complaint." Dkt. No. 31 at 4. The court concluded that the plaintiff's first amended complaint sufficiently stated an Eighth Amendment claim against defendants Utter and John/Jane Doe nurses, whom he alleged provided him inadequate medical treatment. Id. at 9–10.

After Utter filed an answer to the amended complaint, dkt. no. 35, the court issued a scheduling order setting deadlines for the parties to complete discovery and file dispositive motions. Dkt. No. 36. The court also ordered the plaintiff to identify the Doe nurses by December 19, 2022. Id. at 2. The court explained that the plaintiff "must use discovery to identify the proper names of these defendants." Id. The court advised the plaintiff to serve his discovery requests on defense counsel and not to file them with the court. Id. at 1.

About a month later, the court received from the plaintiff a motion to compel discovery. Dkt. No. 37. He also filed yet another motion to amend his complaint, dkt. no. 40, and, a few weeks later, a motion for summary judgment. Dkt. No. 41. About two months after that, the court received a second motion for summary judgment from the plaintiff. Dkt. No. 44. On June 8, 2023, the court issued an order denying the plaintiff's motion to compel as moot because the defendant had provided the plaintiff all the discovery that he requested. Dkt. No. 46 at 2. The court explained that the motion to amend the complaint actually was a motion to substitute the defendants the plaintiff named in his motion in place of the Doe placeholder from his amended

complaint. Id. at 3. The court denied that request because the plaintiff sought to substitute seventeen different nurses in place of the Doe placeholder but did not specifically allege what any of them did that violated his rights. Id. at 3–4. The plaintiff had asserted that all seventeen nurses were responsible "for the same conduct on the same unspecified dates." Id. at 4. The court ordered the plaintiff to file a second amended complaint listing only the defendants "who he believes were *personally* involved in denying him proper medical treatment and provide facts explaining their specific involvement." Id. at 4–5. The court again advised the plaintiff against filing "multiple, piecemeal amended/supplemental complaints." Id. at 5. The court warned the plaintiff that if he did that, or if he otherwise failed to comply with the court's order, the court would not allow those complaints to proceed and would allow him to proceed only against defendant Utter. Id. at 5–6. Finally, the court denied without prejudice the plaintiff's motions for summary judgment, explaining that they were "premature and procedurally improper." Id. at 7. The court explained that, after the plaintiff filed his second amended complaint, the court would issue a new scheduling order with deadlines for "the parties to conduct discovery as to any newly added defendants and setting a new deadline for filing dispositive motions." Id.

The plaintiff did not file a second amended complaint. On July 31, 2023, the court issued an order dismissing the Doe defendants because the plaintiff had failed to prosecute his claims against them. Dkt. No. 48. The court ordered that the plaintiff "***may not*** file another amended complaint." Id. at 2 (emphasis

in original). The court set new deadlines for the plaintiff and Utter—the only remaining defendant—to complete discovery (December 1, 2023) and to file dispositive motions (January 5, 2024). Id. at 2–3.

On October 4, 2023, the court received the plaintiff's (third) motion for summary judgment. Dkt. No. 51. The court granted the defendant's motion to file a single, combined brief in support of her motion for summary judgment and in opposition to the plaintiff's motion for summary judgment. Dkt. No. 56. On January 5, 2024, the defendant filed her combined brief and materials in support. Dkt. Nos. 58–62. The plaintiff timely filed his reply brief in support of his own motion for summary judgment, dkt. no. 64, and responded to the defendant's motion for summary judgment, dkt. nos. 65–68. On February 8, 2024, the defendant filed her reply brief in support of her motion for summary judgment. Dkt. No. 69. Nearly a month later, on March 1, 2024, the court received the plaintiff's motion to appoint counsel. Dkt. No. 70. A month after that, the court received the plaintiff's motion "to add witness/evidence to the record." Dkt. No. 71.

B.    Factual Background

1.    *The Amended Complaint (Dkt. No. 5)*

The amended complaint consists of four hand-written pages and a completed amended complaint form. Dkt. No. 5. The handwritten allegations and the allegations on the complaint form are almost identical. The plaintiff signed both sections of the amended complaint and swore or declared "under penalty of perjury that" the contents of both are "true and correct." Id. at 4, 9. Because the

amended complaint is verified, the court treats it as "the equivalent of an affidavit for purposes of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion.'" Beal v. Beller, 847 F.3d 897, 901 (7th Cir. 2017) (quoting Ford v. Wilson, 90 F.3d 245, 246 (7th Cir. 1996)).

The court summarized the "sparse" allegations of the amended complaint in its August 24, 2022 screening order:

> The amended complaint alleges that the defendants were deliberately indifferent to the plaintiff's medical needs. It alleges that the defendants failed to provide medication or treatment of the plaintiff's symptoms of COVID-19, including pain, congestion, headaches and respiratory issues. The amended complaint alleges that the plaintiff reported these symptoms to the defendants "on numerous occassion [*sic*]." It alleges that the defendants' failure to treat the plaintiff's symptoms put his "life in im[m]inent risk of peril." The amended complaint alleges that the defendants also "tr[i]ed to cover up the[ir] malicious behavior," though it does not elaborate on that allegation.

Dkt. No. 31 at 6–7, 10 (internal citations omitted). The court recounted that the amended complaint "does not provide a timeframe for the allegations. The original complaint—which the amended complaint superseded, or took the place of—alleged that the plaintiff tested positive in August 2020." Id. at 7, n.1 (citing Dkt. No. 1 at 3). The court allowed the plaintiff to proceed on an Eighth Amendment claim that the defendant was "aware of, but disregarded, the substantial risk that COVID-19 presented to the plaintiff's health." Id. at 10. The court allowed the plaintiff to proceed against the defendant in her individual capacity only and only on his request for damages. Id. at 8, 10.

7

2.    *The Plaintiff's Proposed Facts*

The plaintiff was incarcerated at Green Bay during all relevant times. Dkt. No. 53 at ¶1. The defendant was the HSU Manager at Green Bay. Id. at ¶2. On August 18, 2020, the plaintiff tested positive for COVID-19. Id. at ¶3; Dkt. No. 53-1 at 2. He says he was not informed about this positive test result until December 23, 2020, during a psychiatry appointment. Dkt. No. 53 at ¶5; Dkt. No. 54 at ¶4.

The plaintiff filed an institutional complaint in which he complained that the defendant had failed to inform him about his positive test. Dkt. No. 53-1 at 3; Dkt. No. 54 at ¶3. The institutional complaint examiner spoke with the defendant, who confirmed that the plaintiff had "tested positive for COVID-19 in August of" 2020. Dkt. No. 53-1 at 3. The defendant explained that "the practice is to inform the inmate of the test results, however [she] found it appears due to staff error [the plaintiff] was not notified." Id. The defendant also stated that when he tested positive, the plaintiff was housed on Dorm A, "which was in quarantine status due to an outbreak on that unit." Id. She says that staff kept the plaintiff quarantined "in the unit along with the rest of the men living" there. Id.

The complaint examiner recommended affirming the complaint "to acknowledge the error" of failing to notify the plaintiff that he had tested positive for COVID-19. Id. She recounted that the plaintiff "was in quarantine status during that time and did not report any symptoms to HSU." Id. The reviewing authority agreed with the examiner's recommendation and affirmed

the complaint. Id. at 4. She explained that the plaintiff "has since been evaluated in health services for other medical concerns and requests for care." Id. The plaintiff appealed, but his appeal is not in the record. Id. at 6. A corrections complaint examiner recommended affirming the appeal, observing that the plaintiff "did not demonstrate symptoms of COVID 19 [*sic*], and HSU did not notify him of the results in a timely manner." Id. The Office of the Secretary accepted the recommendation and affirmed the appeal without further comment. Id. at 5.

The plaintiff avers that he "requested medical treatment for respiratory complications due to covid-19 from [the defendant], and other HSU staff at Green Bay Correctional." Dkt. No. 54 at ¶5. He says that he "suffered for fiffteen [*sic*] months before [he] was finally treated for respiratory complications at Jackson Correctional" on November 11, 2021 and March 12, 2022. Dkt. No. 53 at ¶6; Dkt. No. 54 at ¶6. He cites generally to his medical records attached to his proposed facts, which include notices of new medications that he received from the HSU on those dates and on July 5, 2022. Dkt. No. 53-1 at 7–8. He also cites his list of "Clinical Diagnoses" and "Problems." Id. at 2. The plaintiff asserts that the delay in receiving treatment for his respiratory issues "exacerbated [his] respiratory complications resulting in [him] getting (COPD) chronic obstructive pulmonary disease." Dkt. No. 53 at ¶7. He again cites generally to his medical records and does not cite a specific page containing information supporting this proposed fact. Id. (citing "Medical records. Ex. A,D,C. [*sic*] index."). The plaintiff avers in his declaration that in addition to COPD, he suffers from hypertension,

"elevated blood pressure[] and excessive anxiety." Dkt. No. 54 at ¶7. He avers that he "did not have any of these physical or mental complications prior to contracting covid-19 on 8-18-20." Id. at ¶8.

The defendant disputes the plaintiff's statements about his treatment. Dkt. No. 62. She asserts that the plaintiff never "requested or needed any treatment for COVID related symptoms during the relevant time period." Id. at ¶¶6–8. The defendant objects to the plaintiff's statements about the cause of his medical conditions, emphasizing that the plaintiff "is not a medical professional who can opine on the cause of medical conditions." Id. at ¶¶7–8 (citing Fed. R. Evid. 701, 702).

3.    *The Defendant's Proposed Facts*

a.    The defendant's Role as HSU Manager

The defendant avers that as the HSU Manager, she managed and supervised health care services for incarcerated persons, developed institution-specific procedures, monitored care plans, prepared reports and served as liaison between the HSU and other units at the institution and with outside providers. Dkt. No. 61 at ¶7. She also provided administrative support to HSU staff and monitored nursing practice documentation in medical records. Id. The defendant avers that the HSU Manager "does not diagnose or prescribe medications for inmate patients." Id. at ¶8. She explains that the HSU staff provide care "within the scope and authority of their respective positions." Id.

The defendant avers that advanced care providers manage medical services for incarcerated patients, while the HSU Manager "provides the overall

administrative support and direction of the unit." Id. at ¶9. She says that as HSU Manager, she "was not aware of every inmate's plan of care or concerns about a plan of care unless it was specifically brought to [her] attention through direct communication." Id. at ¶10. The defendant did not regularly review every patient's medical records. Id. Nor did she have the authority to prescribe medication (other than certain over-the-counter drugs), refer patients to offsite specialists, approve recommendations from offsite providers or order imaging studies. Id. at ¶11. She reiterates that advanced care providers are responsible for final treatment decisions and care plans, writing prescriptions, making offsite referrals and approving recommendations from offsite providers. Id. at ¶12. The defendant says she deferred to advanced care providers' treatment decisions and did not have authority to override or alter those decisions. Id. at ¶13.

> b.    Health Service Requests

Green Bay provides new incarcerated persons a handbook explaining how they can request medical care, including emergency care. Id. at ¶14. The defendant avers that an incarcerated person who has a medical concern must fill out a Health Service Request (HSR) and submit it to the HSU. Id. at ¶15. An incarcerated person can ask to see HSU staff by checking the appropriate box on the HSR. Id. at ¶19. He also can request a sick call if he needs immediate treatment. Id. at ¶20. Nursing staff triage these requests daily and schedule appointments; nurses then see patients to determine whether they need to be

referred to an advanced care provider, such as a doctor or nurse practitioner. Id. at ¶¶15, 20.

The defendant avers that as HSU Manager, she typically did not see HSRs unless nursing staff forwarded them to her to address a particular issue. Id. at ¶16. She says that even if an incarcerated person addresses an HSR to her, she will review it only if nursing staff forward it to her. Id. at ¶17. In other words, listing the defendant's name on an HSR "did not ensure that [she] would be the staff member to review it." Id. The defendant avers that the triaging nurse is in the best position to respond to an HSR, even if it is addressed to the defendant. Id. at ¶18. She reiterates that the triaging nurse generally responds to HSRs without forwarding them to the defendant, whose "role as [HSU Manager] was primarily administerial." Id.

The plaintiff disputes the defendant's description of the HSR procedures and insists that it was the defendant's duty "to manage and supervise health care services provided to inmates" and "to oversee health care services inmates received." Dkt. No. 68 at ¶¶13–15.

c.    The Plaintiff's COVID-19 and Medical Treatment

In August 2020, the Wisconsin National Guard conducted mass COVID-19 testing at Green Bay. Dkt. No. 60 at ¶18. The defendant avers that as the HSU Manager, she received the mass testing results from the Department of Health Services after the state lab processed them. Dkt. No. 61 at ¶44. She shared those results with nursing staff "to verbally inform the patient of the positive result, and then update the lab result within the medical

record." Id. She says over 200 incarcerated persons who were tested in August 2020 received positive test results. Id. at ¶48. She directed nursing staff to verbally inform anyone who tested positive of the results, but those "verbal conversations were not documented within the medical record." Id.

On August 18, 2020, the plaintiff was tested for COVID-19, and the results showed he was positive for the virus. Dkt. No. 60 at ¶19; Dkt. No. 61-1 at 1. The defendant says the HSU did not receive notification of the plaintiff's positive result until August 23, 2020. Dkt. No. 61 at ¶23. The page of the plaintiff's medical records that the defendant cites does not provide the date the Department of Health Services informed Green Bay about the results. Dkt. No. 61-1 at 1.

The same day that the plaintiff was tested for COVID, the HSU received his request complaining of trouble with his eyes and asking to see an eye doctor for glasses. Dkt. No. 61-1 at 31. A registered nurse responded the same day (August 18, 2020) and added the plaintiff to the non-urgent sick call list. Id. About a month later, on September 14, 2020, the plaintiff saw nursing staff in the HSU for a nurse sick call appointment. Id. at 5–7. He complained about trouble reading and that his ears were plugged. Id. Nursing staff issued him eardrops and scheduled him for a follow-up to flush his ears. Id. They told the plaintiff that optical staff were not yet back to work because of COVID, but that they would add him to the list to see them. Id. The plaintiff agreed with this plan and reported no other issues and no symptoms of COVID-19 (including abdominal pain, chills, cough, fatigue, loss of smell or taste, runny nose,

shortness of breath or sore throat). Id. The plaintiff returned for his ear follow-up on September 18, 2020. Id. at 10. The nurse reported that his ears were clear and instructed the plaintiff to notify the HSU if his symptoms returned. Id. The plaintiff "versed understanding and appreciative [*sic*]." Id.

On November 23, 2020, the HSU sent the plaintiff a letter notifying him that his "COVID test result from the National Guard was inconclusive," so he would have to report for retesting. Id. at 15. The defendant avers that this second test had occurred on November 16, 2020. Dkt. No. 61 at ¶27. The plaintiff reported to the HSU for retesting the next day. Dkt. No. 61-1 at 9. The defendant states that the plaintiff's medical reports show that he denied having "any current COVID S/S [symptoms]." Id.; Dkt. No. 61 at ¶28. The plaintiff disputes this and says that "at the time of being swabbed [he] reported respiratory complications." Dkt. No. 68 at ¶24. In support he cites generally to his declaration but does not identify a specific paragraph that supports his dispute. Id. (citing "Ducksworth Decl. Attached"). His declaration generally asserts that he "reported symptoms such as fever, hot/cold spells, and respiratory complications during the relevant timeframe." Dkt. No. 66 at ¶3. He does not say when he reported his symptoms or to whom he reported them. Id.

On November 27, 2020, the plaintiff again was tested for COVID-19 because the lab had not processed his swab from November 24, 2020. Dkt. No. 60 at ¶25. The defendant avers that this swab was negative for COVID-19, but the page of the plaintiff's medical records that she cites does not specify the results of the test. Dkt. No. 61 at ¶29 (citing Dkt. No. 61-1 at 9).

On January 15, 2021, the HSU received an HSR from the plaintiff in which he requested "something for chest congestion and Mucus (Mucinex) (Sudafed)." Dkt. No. 61-1 at 30. A registered nurse responded the same day and scheduled the plaintiff to be seen by nursing staff. Id. Nursing staff saw the plaintiff the same day. Id. at 8–9. The plaintiff's medical records show that he complained about congestion, documenting that he was "more congested the last few days, mostly at night, blows nose and has lt yellow/clear mucus. Coughs occasionally at night, clear sputum." Id. at 8. The nurse reported that the plaintiff's lungs sounded clear, and that he showed no coughing or congestion during the appointment. Id. She told him to increase his liquids and self-monitor his symptoms, and she "educated to [*sic*] reasons to contact HSU." Id. at 8–9. The plaintiff's records show that he stated that he understood the nurse's instructions. Id. at 9. The plaintiff does not dispute these proposed facts but says that he "[a]lso reported respiratory complications"; he does not specify whether he reported these complications in his HSR or to the nurse during the appointment. Dkt. No. 68 at ¶¶26–27. He cites nothing in support of these statements, and neither his HSR nor his medical records say anything about respiratory complications. Dkt. No. 61-1 at 8–9, 30.

On January 19, 2021, the HSU sent a letter to the plaintiff informing him that his COVID-19 test results were negative. Id. at 14–15. The defendant avers that that test had occurred on January 11, 2021. Dkt. No. 61 at ¶33. On January 28, 2021, the plaintiff refused a COVID-19 vaccine. Dkt. No. 61-1 at

24. The plaintiff avers that he refused the vaccine "because it was new, and [he] was afraid of risk of side effects." Dkt. No. 66 at ¶4.

On February 15, 2021, the HSU received a request from the plaintiff to review his medical records. Dkt. No. 61-1 at 28. A registered nurse responded the same day and informed the plaintiff that he was on the waitlist to review his medical records. Id.

On March 26, 2021, the HSU received a request from the plaintiff in which he complained that he was "having trouble breathing at night," which made it "hard to sleep." Id. at 27. He said that his symptoms "occur[red] mostly throughout the day but mainly at night." Id. A registered nurse responded the same day and scheduled the plaintiff to see nursing staff. Id. On March 30, 2021, the plaintiff saw nursing staff at the HSU for a sick call. Id. at 3–4. The nurse who treated the plaintiff wrote that he showed no symptoms of COVID-19, including abdominal pain, chills, cough, fatigue, fever, loss of smell of taste, runny nose or sore throat. Id. at 3. The nurse also observed that the plaintiff's lungs were clear, and she did not observe any shortness of breath during their conversation. Id. at 4. The plaintiff reported that he had been experiencing anxiety, and the nurse discussed working with the Psychological Services Unit to practice deep breathing when he felt anxious. Id. She advised the plaintiff to notify the HSU if his symptoms worsened. Id. The plaintiff agreed with the plan of care and expressed "no further HSU concerns at this time." Id. The plaintiff disputes the defendant's account of this nursing visit and reiterates that he "did not receive any treatment for respiratory

complications until he was at Jackson Correctional." Dkt. No. 68 at ¶33 (citing Dkt. No. 54 at ¶6).

On April 16, 2021, the defendant sent the plaintiff a letter informing him that an appointment he had with the Psychological Services Unit was rescheduled for the following week. Dkt. No. 61-1 at 19. On April 22, 2021, the plaintiff again refused a COVID-19 vaccine. Id. at 23. On May 21, 2021, the HSU sent the plaintiff a letter informing him that his recent COVID-19 test results were negative. Id. at 17–18. The defendant avers that this test had been conducted on April 26, 2021. Dkt. No. 61 at ¶40.

On June 10 and 21, 2021, HSU staff screened the plaintiff for COVID-19. Dkt. No. 61-1 at 11–12 (June 21), 12–13 (June 10). His medical records show that during both visits, he presented no symptoms of COVID-19, including cough, fatigue, fever, headache, runny nose, shortness of breath or sore throat. Id. The plaintiff disputes the defendant's description of these visits and again generally asserts that he "reported respiratory complications." Dkt. No. 68 at ¶¶37–38. In support he again cites the statement in his declaration that he did not receive treatment for respiratory complications until he was transferred to Jackson Correctional Institution. Id. (citing Dkt. No. 54 at ¶6). He also cites the exhibit attached to his proposed facts listing the medications he received at Jackson. Id. (citing "Ex. C" (Dkt. No. 53-1 at 7–9)). On June 23, 2021, the plaintiff was transferred to Jackson. Dkt. No. 60 at ¶39; Dkt. No. 61-1 at 16.

The defendant avers that in "the period after he tested positive for COVID-19 in August 2020, [the plaintiff] did not submit any HSRs in which he

complained about COVID-19, or about not receiving adequate treatment for COVID-19." Dkt. No. 60 at ¶45. She reiterates that even if he had reported symptoms or requested treatment, as the HSU manager she would not have been the person who would have treated the plaintiff's symptoms or ordered treatment. Id. at ¶46. She reiterates that she was not involved in any decisions regarding the plaintiff's medications for any reported symptoms. Id. at ¶47. She says she did not make any decision on what types of treatment the HSU should order or pursue for his medical concerns. Id.

The plaintiff disputes the defendant's statements and says that she "never responded to any of [his] correspondence regarding treatment." Dkt. No. 68 at ¶42. He says his "HSR's to [the defendant] and nursing staff was [*sic*] also disregarded." Id. He does not cite any HSRs that he submitted about COVID-19 or related symptoms, including those that he attached to his proposed facts as "Exhibit D." See Dkt. No. 53-1 at 10–58. He again cites his general statement in his declaration that he requested treatment for respiratory complications from the defendant and other staff and his statement that he did not receive treatment until he was transferred to Jackson. Dkt. No. 68 at ¶42 (citing "Ducksworth Decl. 5, 6" (Dkt. No. 54 at ¶¶5–6)). He also again generally cites the notifications of medications he received while at Jackson. Id. (citing "Ex. C").

## II.    Discussion

### A.    Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Neither argument nor speculation is enough to avoid summary judgment. See Ammerman v. Singleton, 817 F. App'x 265, 268 (7th Cir. 2020) (citing Herzog v. Graphic Packaging Int'l, Inc., 742 F.3d 802, 806 (7th Cir. 2014)). Instead, the non-moving party "needs to come forward with *evidence*" that would allow a jury to return a verdict in his favor if the case proceeded to trial. See Beatty v. Olin Corp., 693 F.3d 750, 754 (7th Cir. 2012).

### B.    Eighth Amendment

As the court explained in the screening order, the court analyzes the plaintiff's claim that the defendant was deliberately indifferent to his serious medical need under the Eighth Amendment's cruel and unusual punishments

19

clause. Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id.

In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)). "A medical condition is deemed to be serious if it may be 'life threatening or pose[s] a risk of needless pain or lingering disability if not treated at once.'" Karraker v. Peters, 65 F.3d 170 at *3 (7th Cir. 1995) (citing Davis v. Jones, 936 F.2d 971, 972 (7th Cir. 1991)).

To satisfy the subjective component, the plaintiff must demonstrate that the defendant had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. This requires a showing of "'more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart, 14 F.4th at 763 (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)). In other words, the evidence must show the defendant's "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." Ayoubi v. Dart, 724 F. App'x 470, 474 (7th Cir. 2018) (citing Farmer, 511 U.S. at 837, 844–45).

C. <u>Analysis</u>

1. *The Plaintiff's Motion for Summary Judgment*

A party moving for summary judgment must include with the motion "a statement of proposed material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." Civil Local Rule 56(b)(1)(C) (E.D. Wis.). The proposed facts must include "specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon to support the fact described in that paragraph." Civil L.R. 56(b)(1)(C)(i). The plaintiff did not comply with Rule 56(b)(1)(C)(i) because his proposed facts in support of his motion for summary judgment do not include "specific references" to the supporting materials. He generally cites one or more of his exhibits, which range from one page in length ("Exhibit A") to forty-eight pages in length ("Exhibit D"). <u>See</u> Dkt. No. 53 at ¶3, (citing "Medical record. Ex. A. index"), ¶¶4–5 (citing "I.C.E. reports. Ex. B. index), ¶6 (citing "Medical records. Ex. A,C. index"), ¶¶7–8 (citing "Medical records. Ex.A,D,C. [*sic*] index"). The court is not required to wade through the plaintiff's exhibits to determine which page, if any, is relevant to the proposed fact the party believes it supports. <u>See</u> Fed. R. Civ. P. 56(c)(3); <u>Jordan v. Block</u>, No. 21-CV-1473, 2023 WL 6318742, at *3 (E.D. Wis. Sept. 28, 2023) (citing <u>Gross v. Town of Cicero, Ill.</u>, 619 F.3d 697, 702 (7th Cir. 2010)).

The court could deny the plaintiff's motion based solely on his failure to comply with the Local Rules. <u>See</u> Civil L.R. 56(b)(9) ("Failure to comply with the requirements in this rule may result in sanctions up to and including the Court

21

denying or granting the motion."); see also Hinterberger v. City of Indianapolis, 966 F.3d 523, 528 (7th Cir. 2020) ("[D]istrict courts may require strict compliance with their local rules."); Smith v. Adams, 804 F. App'x 390, 391 (7th Cir. 2020) (same for *pro se* plaintiffs). The court will not do so, and will reach the merits of the plaintiff's motion. But the court finds that the plaintiff has failed to present evidence showing he is entitled to judgment as a matter of law and will deny his motion.

The plaintiff asserts that the defendant knew that he had contracted COVID-19 and knew that he was at a serious risk of harm but failed to inform him of that positive test and provide him treatment for the respiratory complications he suffered. Dkt. No. 52 at 4–7. It is undisputed that the plaintiff contracted COVID-19 in August 2020 and tested positive during the National Guard's mass testing at Green Bay on August 18, 2020. It is not clear when the HSU became aware that the plaintiff had tested positive. The defendant says the HSU was informed of the plaintiff's positive test on August 23, 2020, but the evidence she cites does not support her statement. It is undisputed that HSU staff did not inform the plaintiff about his positive test in August 2020. The exact date that HSU staff learned that the plaintiff had tested positive and whether the defendant informed him about the positive test are immaterial, however, because the court did not allow the plaintiff to proceed on a claim that the defendant knew about but failed to tell the plaintiff that he had tested positive. The court allowed the plaintiff to proceed on a claim related to his alleged treatment for symptoms sometime after he tested positive. But the

plaintiff has presented no evidence showing that the defendant was aware that he had symptoms of or complications from COVID-19, disregarded his concerns and failed to provide him treatment.

The plaintiff asserts that the defendant "never responded to any attempts made by [the plaintiff] seeking medical treatment." Dkt. No. 52 at 5. He says that those requests "fell on deaf ears," and that "[the defendant] never responded to any requests for medical care from [the plaintiff] about respiratory complications." Id. at 5–6. He says the defendant "allowed [him] to go untreated for respiratory complications for fiffteen [sic] months, which exacerbated [his] injuries physically, mentally, and emotionally." Id. at 6. But the plaintiff does not identify any HSR complaining about COVID-19 symptoms or respiratory complications that the defendant viewed or otherwise was aware of and disregarded. As the court noted above, the plaintiff attached forty-eight pages of Health Service and Psychological Service Requests that he filed from December 29, 2020, through May 1, 2023. Dkt. No. 53-1 at 10–58. Most of these requests are irrelevant to his claim against the defendant because he filed them after June 23, 2021 (when he was transferred from Green Bay to Jackson). Id. at 12, 18–58. Even if these requests were relevant, none of the requests that he filed while at Green Bay have a checked box showing that nursing staff forwarded the request to the defendant. The plaintiff does not specify which requests, if any, relate to his COVID-19 symptoms or

complications. Nor does he say which of these requests the defendant viewed and/or knew about and then disregarded.[1]

Nor did the plaintiff present other medical records or evidence showing that he ever informed the defendant about COVID-19 complications and she ignored him. The plaintiff provided notifications that he received while at Jackson informing him of new medications he was to begin taking for his medical conditions. But he has provided no evidence showing that he was suffering from any of those conditions at Green Bay, that the defendant was aware of his conditions or that the defendant refused or failed to provide him treatment for those conditions. The plaintiff asks the court to infer that because he received treatment when he arrived at Jackson, he needed—but did not receive—that same treatment while he was at Green Bay. The plaintiff's scant evidence does not allow for such an inferential leap.

The plaintiff avers in his declaration that these conditions—COPD, hypertension and excessive anxiety—appeared only after he contracted COVID-19. Dkt. No. 54 at ¶¶7–8. In his proposed facts he asserts that it was the delay in treatment after he contracted COVID-19 that caused these conditions. Dkt. No. 53 at ¶7. But the plaintiff is not a medical professional, has no medical training and is not qualified to give an opinion on the cause of

_____

[1] The plaintiff's statement that he went fifteen months without treatment is unsupported. It is undisputed that the plaintiff tested positive for COVID-19 around August 18, 2020, and was transferred to Jackson on June 23, 2021, where he says he received treatment for his respiratory issues. That is ten months, not fifteen. The defendant is not responsible for treatment the plaintiff did not receive at a different institution.

his medical issues. See Fed. R. Evid. 701, 702. He has presented no evidence showing a link between any purported delay in treatment for COVID-19 symptoms and him developing COPD or his other conditions.

It was the plaintiff's burden as the moving party to present evidence showing that he was entitled to judgment as a matter of law on his Eighth Amendment claim against the defendant. He has failed to do so. On the sparse evidence the plaintiff presented, no reasonable jury could find that the defendant was aware of, but deliberately disregarded, the plaintiff's COVID-19 symptoms or complications at Green Bay from August 2020 through June 2021. The court will deny the plaintiff's motion for summary judgment.

2.    *The Defendant's Motion for Summary Judgment*

The court assumed in the screening order that COVID-19 is an objectively serious medical condition for purposes of an Eighth Amendment claim. Dkt. No. 31 at 9. The defendant does not contest that finding. The only question is whether the defendant was subjectively aware of the plaintiff's COVID-19 symptoms or complications and disregarded them.

The undisputed evidence would not allow a reasonable jury to find that the defendant was subjectively aware that the plaintiff was suffering from severe COVID-19 symptoms (including respiratory complications) but disregarded his medical needs. It is undisputed that in her role as HSU Manager at Green Bay, the defendant did not treat patients; the role of HSU manager was an administerial position in which she supervised HSU staff and performed various administrative roles. The plaintiff disputes the defendant's

25

description of her duties and insists that she was responsible for monitoring incarcerated persons' care plans, triaging and reviewing all HSRs and updating the medical files for all incarcerated persons. But the plaintiff has no personal knowledge about the defendant's specific job duties or responsibilities and cannot create a genuine dispute of fact by objecting to her description of her job duties. See Cambronero v. Meli, Case No. 22-2103, 2023 WL 4946724, at *2 (7th Cir. Aug. 3, 2023) (citing Pulera v. Sarzant, 966 F.3d 540, 550–51 (7th Cir. 2020)). Prisons "divide tasks" to ensure "efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen." Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009). The defendant is not liable for not performing the duties of other HSU staff.[2]

The defendant avers that she reviewed HSRs from incarcerated persons only when a triaging nurse referred one to her for her review. As the court has explained, the plaintiff has not identified any HSR that he filed—in his own exhibits or in the defendant's—complaining about COVID-19 symptoms or complications. Even if he had, he has presented no evidence showing that the defendant both reviewed and disregarded his HSRs. None of the HSRs in the defendant's exhibits were referred to the defendant, and the HSU addressed most of them the same day it received them from the plaintiff.

_____

[2] The plaintiff also has no claim against the nurses who triaged his HSRs or provided treatment because, as the court discussed above, he failed to comply with court orders and identify any nurse who personally and inadequately treated him. See Dkt. Nos. 46, 48.

There is no evidence that after testing positive in August 2020, the plaintiff reported to medical staff that he was experiencing symptoms of COVID-19. His HSRs from August and September 2020 relate to concerns about his eyes and ears. Even if these symptoms were related to COVID-19, none of these HSRs were referred to the defendant, and there is no evidence that she saw them or was aware of the plaintiff's concerns. When the plaintiff again was tested for COVID-19 in November 2020, he did not complain about any symptoms or submit any HSRs regarding COVID-19 symptoms or concerns. There is no evidence that the plaintiff was suffering COVID-19 symptoms in the fall of 2020 or that he told anyone at Green Bay that he was and that he needed treatment.

The plaintiff points to his declaration as support for his position that he informed staff about his symptoms. But his declaration says only that he "reported symptoms such as fever, hot/cold spells, and respiratory complications during the relevant timeframe." Dkt. No. 66 at ¶3. He does not specify when he reported these symptoms (in the fall of 2020? in December 2020 after he learned that he had tested positive? in 2021 before his transfer to Jackson?), does not say how he reported them (in person? via HSR? or letter?) and does not say to whom he reported his symptoms. Most important, he does not aver that he told *the defendant* about his respiratory complications or other symptoms. His general statement that he reported his symptoms to someone at some point between August 2020 and June 2021 is not evidence that the

defendant was subjectively aware of the plaintiff's symptoms or respiratory complications.

There is evidence that the plaintiff complained about respiratory issues in at least one HSR. On March 26, 2021, the HSU received an HSR from the plaintiff complaining that he was having trouble breathing at night. Dkt. No. 61-1 at 27. The HSU responded the same day and scheduled him to see a nurse, which he did four days later. Id. The nurse recorded that the plaintiff had no reported symptoms of COVID-19 besides difficulty breathing, but that the plaintiff was not short of breath during the appointment. Id. at 3–4. The nurse provided medical advice, and the plaintiff reported understanding the plan of care. Id. The HSR was not referred to the defendant, id. at 27, and there is no evidence that she saw it or was aware of the plaintiff's complaint of difficulty breathing and disregarded it. Nor is there evidence that any medical staff disregarded the plaintiff's HSR or his medical concerns. The evidence shows that HSU staff immediately responded to the plaintiff's concern, scheduled him for treatment and then provided treatment.

In response to the defendant's motion for summary judgment, the plaintiff says that "[the defendant] and her subordinate nursing staff had full control of all HSR's that [he] submitted during the relevant timeframe." Dkt. No. 67 at 1. The plaintiff suggests that the defendant deliberately omitted certain HSRs in which he requested treatment for his COVID-19 symptoms or complications. Id. The plaintiff cannot create a genuine dispute of fact by claiming—without evidentiary support—that the defendant omitted relevant

parts of his medical records. See Davis v. Gee, Case No. 14-cv-617, 2017 WL 2880869, at *5 (W.D. Wis. July 6, 2017) (citing Scott v. Harris, 550 U.S. 372 (2007); Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008)) (explaining that allegations that are "based on little more than speculation . . . [are] insufficient to manufacture a genuine issue of fact at summary judgment."). More important, as the court has explained, the plaintiff submitted nearly fifty pages of his own Health Services and Psychological Services requests with his motion for summary judgment but failed to point to any that support his claim that the defendant ignored him. This suggests that, contrary to the plaintiff's assertion, he also has access to his HSRs, and either he failed to present any relevant ones as evidence in support of his motion for summary judgment or he never filed any HSRs about COVID-19 symptoms or complications at Green Bay.

The undisputed evidence would not allow a reasonable jury to find that the defendant was aware that the plaintiff complained about COVID-19 symptoms or complications in his HSRs. The plaintiff's medical records show that none of the HSRs he sent from August 2020 through June 2021 (when he was transferred to another institution) were referred to the defendant. Nor would the undisputed evidence allow a reasonable jury to find that, even if the defendant was aware of the plaintiff's HSRs, she deliberately disregarded them. The plaintiff's medical records show that when he complained about a medical issue during the relevant time—whether COVID-19 related or not—he received prompt and immediate, or almost immediate, treatment. The undisputed

evidence does not support the plaintiff's assertion that the defendant forced him to wait months for treatment for his COVID-19 symptoms or complications. The evidence shows that the plaintiff did not complain for months about concerns potentially related to COVID-19 or request treatment for his concerns. No reasonable jury could conclude that the defendant was subjectively aware of and deliberately indifferent to the plaintiff's COVID-19 symptoms or any health issues he suffered after contracting COVID-19. The court will grant the defendant's motion for summary judgment and dismiss the case.[3]

## III.    The Plaintiff's Tardy Motions (Dkt. Nos. 70, 71)

On March 1, 2024, about a month after the defendant filed her reply brief in support of her motion for summary judgment, the court received the plaintiff's motion to appoint counsel. Dkt. No. 70. He gave no reason why he did not and could not have filed this motion sooner, before he filed his motion for summary judgment. Because the court is dismissing the case, it will deny as moot the plaintiff's motion to appoint counsel. Dkt. No. 70.

About a month after receiving the plaintiff's motion to appoint counsel, the court received his motion to add a new witness and that witness' declaration as evidence. Dkt. No. 71. The plaintiff seeks to add a declaration

---

[3] Because the court is granting summary judgment to the defendant on the merits, it will not analyze her claim that she is entitled to qualified immunity. See Sierra-Lopez v. County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (citing Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

from Juan Nava, whom the plaintiff says he "had recently discovered." Id. at ¶2. He cites no authority for his motion, but he says that he makes his motion "in 'good faith.'" Id. at ¶1. Nava's declaration is written in the plaintiff's handwriting. Dkt. No. 71-1. Nava says that he was incarcerated at Green Bay during the August 2020 COVID-19 outbreak. Id. at 1. He avers that he became severely ill, and the plaintiff and other incarcerated persons notified staff to help him. Id. Nava avers that he "witnessed [the plaintiff] struggling with health complications during the same time [Nava] learned [he] had contracted COVID-19." Id. Nava says he "know[s] this for a fact because [he] was housed in Dorm A in the bunk next to" the plaintiff. Id. He says he "was removed from Dorm A and quarantined for ten days." Id. When he returned from quarantine, "people were sick and severly [sic] ill." Id.

The plaintiff filed his motion for summary judgment almost eight months ago, on October 4, 2023. Dkt. No. 51. He provides no reason why he could not have obtained Nava's declaration earlier. Nava's declaration says he was in the same housing unit as the plaintiff and slept in the bunk next to him. It is difficult to believe that the plaintiff did not become aware until six and a half months after filing his summary judgment motion that his bunkmate also was ill and witnessed the plaintiff becoming ill in August 2020. Even if the court were to consider Nava's declaration, it would not impact the court's ruling. Nava says nothing about the defendant or whether she was aware that the plaintiff was ill and disregarded him. The plaintiff averred in his own declaration that he contracted COVID-19 in August 2020. The fact that another

31

incarcerated person also was aware that the plaintiff was sick does not support his claim against the defendant. The court will deny the plaintiff's motion.

## IV. Conclusion

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 51.

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 58.

The court **DENIES AS MOOT** the plaintiff's motion to appoint counsel. Dkt. No. 70.

The court **DENIES** the plaintiff's motion to add witness/evidence. Dkt. No. 71.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion in *this*

*court.* See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. Pro. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. Pro. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 29th day of May, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**